**CUSHMAN AND WAKEFIELD, INC. and Cushman and Wakefield of Texas, Inc., Appellants,**

v.

**Richard F. FLETCHER, Appellee.**

**No. 05–94–00781–CV.**

Court of Appeals of Texas, Dallas.

Nov. 30, 1995.

---

**540**

W. Alan Wright, LaDawn H. Conway, Haynes & Boone, L.L.P., Dallas, for appellants.

Kennth H. Molberg, Wilson Williams Molberg & Mitchell, P.C., Dallas, for appellee.

Before OVARD, BARBER and JAMES, JJ.

## OPINION

OVARD, Justice.

Appellants Cushman & Wakefield, Inc. and Cushman & Wakefield of Texas, Inc. (collectively referred to as "C & W") appeal from a judgment in favor of appellee Richard Fletcher in his suit for breach of an employment contract. After a bench trial, the trial court awarded Fletcher damages and interest in excess of $700,000. In ten points of error, C & W contends generally that the evidence is legally and factually insufficient to support the trial court's findings that C & W did not prove Fletcher was terminated for cause or with written notice, that Fletcher would have remained employed with C & W, and that he would have earned no less than $35,000 per year until his retirement. C & W also asserts that the trial court erred in awarding Fletcher lost wages until retirement, in failing to discount the future lost wages to the date of judgment, and in awarding withheld commissions, attorney's fees, and prejudgment interest on the attorney's fees. We affirm in part, reverse and render in part, and remand the cause to the trial court for recalculation of prejudgment interest.

## FACTS

In March of 1980, C & W hired Fletcher as a retail real estate broker, and the parties entered into a written employment contract. Regarding termination, the contract provided that, by giving written notice, C & W could terminate Fletcher's employment either with or without cause. Specifically, the contract stated the following:

> 5. Employment under this Agreement ... shall continue until terminated by either party giving fourteen (14) days prior written notice to the other of the election to terminate. C & W shall have the right to terminate Employee's employment immediately by written notice to Employee where such termination is for cause, including without limitation, for Employee's dishonesty, fraud, or misrepresentation to C & W or any third person....

It is undisputed that C & W terminated Fletcher's employment on October 23, 1987.

Fletcher sued C & W for breach of contract, alleging that C & W did not have cause to terminate his employment and failed to give him the required written notice. In response, C & W claimed that it fired Fletcher because Fletcher made misrepresentations to prospective tenants which were beyond the scope and authority of his employment. The trial court found that C & W did not prove that it had terminated Fletcher for cause. The court also found that Fletcher was never given written notice of termination. The court awarded Fletcher $218,750.01 in past lost wages, $171,048.54 in future lost wages, $35,000 in withheld commissions, and $57,000 in attorney's fees. The court also awarded postjudgment interest and prejudgment interest on the past lost wages, commissions, and attorney's fees.

The dispute over Fletcher's termination centers on C & W's involvement in a commercial development on the San Antonio Riverwalk. In 1983, RepublicBank and Republic of Texas Properties began developing the RepublicBank Plaza, which was to consist of a bank building, an office building, retail shops, and eventually an office tower. The bank hired C & W as its leasing agent for the Plaza. Fletcher was responsible for leasing the 22,000 square feet of retail space, room for about eight to ten shops. He was not involved in office space leasing. Leasing office space eventually became a problem due to the poor economy in San Antonio at the time. When the office building opened in April of 1985, it had just one tenant. RepublicBank never built the office tower.

Fletcher testified that the people working in the office building were supposed to create pedestrian traffic for the retail shops. Thus, the prospects for leasing the retail space depended upon adequate leasing of the office space. Many of the prospective tenants to whom Fletcher spoke inquired about how leasing was going in the office building. Fletcher testified that in such instances he referred the tenants to the bank or the person leasing office space. Fletcher stated that he was not privy to how much office space had been leased. In the first quarter of 1985, sixty percent of the retail space had been leased, but only one tenant had leased space in the office building.

In March of 1985, Fletcher wrote a memorandum to Charles Bridges and William Barnes with Republic of Texas Properties in which he stated that the lack of office tenants was a major problem in his retail leasing program. Prospective and committed tenants were asking Fletcher about the occupancy of the office building. Fletcher testified that he had attempted to discuss with Bridges how much office space had been leased, or was being represented as leased, but Bridges was not interested in the discussion. Fletcher testified that he wrote the memorandum in an attempt to get information about the occupancy level of the office building. Bridges did not respond to the memo.

Five retailers leased space in the Plaza. Fletcher testified that one of these businesses, D. Simon Fine Jewelers, moved out of the Plaza shortly after it moved in. David Simon of D. Simon Fine Jewelers eventually sued C & W over the lease, and Fletcher testified that Simon's allegations involved Fletcher's conduct. C & W hired a law firm to defend against that suit.

Fletcher testified that, in addition to the retail space actually leased, he had also obtained several letters of intent. If the retailers who signed letters of intent had signed leases, the retail space would have been about eighty percent occupied. Fletcher denied that he ever made the statement that sixty percent of the office space had been leased. Fletcher testified that he never misrepresented the occupancy levels of either the office or retail space. He also stated that, during the time he worked on the Plaza project, he did not do any act that he knew to be unauthorized or outside the scope of his employment.

On October 23, 1987, James Vanderslice, C & W's Dallas branch manager, orally terminated Fletcher's employment. Jay Dee Allen, formerly an executive vice-president with C & W, was present during the termination meeting. Fletcher testified that C & W did not give him written notice of termination or a reason for termination. During the meeting, Vanderslice referred to a piece of

scratch paper. Fletcher asked if he could make a copy of the paper, and he was allowed to do so. The paper stated, "Richard your methodology and manner of doing business is not the same as C & W. In the past you have acted outside the scope of your employment cont." Below this language, the paper also listed the words "401K," "legal fees," and "off the top deficit."

Fletcher testified that he had intended to continue working for C & W until he retired. Fletcher estimated that he would retire at age seventy-five. He was seventy at the time of trial in January of 1994.

On behalf of C & W, Jay Dee Allen testified that about twenty-five percent of the office space at the Plaza had been pre-leased. When construction was completed, thirty percent of the office space had been leased. According to Allen, C & W held periodic meetings on the status of the Plaza project, and Fletcher attended these meetings. The participants discussed the amount of retail and office space that had been leased. Later, Robert Edge, executive director for Cushman & Wakefield of Texas, also testified that Fletcher was present at meetings when the occupancy of the office space was discussed. Allen testified that, at these meetings, he never heard that sixty percent or more of the office space had been leased. Allen stated that some of the retailers in the Plaza had complained to him about Fletcher and that C & W was involved in litigation with unhappy retail tenants.

Allen further testified that he was involved in the decision to terminate Fletcher. Allen, who was present when Fletcher was fired, testified that Fletcher was given a reason for his termination. Allen stated that Fletcher was fired because "we had suit brought upon us for misrepresentation." Allen's recommendation that Fletcher be terminated was based on conversations Allen had with other people. Allen admitted that the written material given to Fletcher at the termination meeting did not state that Fletcher had been fired or terminated.

James Downey, senior counsel with C & W, testified that David Sylvan, Inc., which was apparently doing business as D. Simon Fine Jewelers, sued C & W. C & W hired a San Antonio law firm to handle the suit, and the case was settled. Fletcher wrote Downey a memorandum regarding Simon's complaints. In his memo, Fletcher denied making any specific representations to Simon about how much space was leased.

C & W also provided the testimony of four people who had discussed leasing retail space with Fletcher. David Simon, a retail jeweler, testified that he spoke to Fletcher about leasing retail space in the Plaza for his business, D. Simon Fine Jewelry. Fletcher told Simon that the Plaza was going to be the center of the business community in San Antonio and that "the office part of the building" was sixty percent leased. Simon entered into a lease for space at the Plaza sometime before April of 1985. His business moved into the Plaza in April of 1985 and moved out in February of 1986.

Stephen Lang, a partner in Simon's jewelry business, testified that Fletcher told him that "sixty percent of the office building space is committed." Lang stated that Fletcher's representations that over half of the building had been leased to the type of tenants the jewelry store did business with influenced Lang's decision to enter into a lease. Lang later began to doubt the truth of Fletcher's representations because there were no retail tenants in the building and he had personal knowledge of only one office tenant.

Stephen Rubin, president of Joseph's Men's Stores, testified that he spoke with Fletcher about possibly leasing retail space in the Plaza. Rubin stated that Fletcher told him that the office space was fifty to sixty percent pre-leased, although Rubin did not believe those numbers. Rubin testified that those occupancy percentages had appeared in the newspapers. Rubin never leased space in the Plaza because Fletcher's offer did not fit Rubin's needs.

Sherry Muller testified that she owned a chain of flower shops and had considered opening a store in the Plaza. In 1984, Muller spoke with Fletcher about leasing space at the Plaza, and Fletcher told her that, although the building would not be completed for two or three years, it was going to be

eighty percent occupied. Muller never signed a lease for space in the Plaza.

## SUFFICIENCY OF THE EVIDENCE

■ In points one, two, and a portion of point four,[1] C & W challenges the legal and factual sufficiency of the evidence to support the trial court's findings regarding whether C & W had cause to terminate Fletcher's employment and whether C & W provided Fletcher with written notice of termination. When an agreement requires cause to terminate an employee, the burden of proof for establishing cause rests upon the employer. *Advance Ross Elecs. Corp. v. Green,* 624 S.W.2d 316, 318 (Tex.Civ.App.—Tyler 1981, writ ref'd n.r.e.), *cert. denied,* 458 U.S. 1108, 102 S.Ct. 3488, 73 L.Ed.2d 1370 (1982); *see Watts v. St. Mary's Hall, Inc.,* 662 S.W.2d 55, 58 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). Because C & W had the burden of proof, we can sustain its points of error only if the record shows that the facts were established as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989); *Smith v. Central Freight Lines, Inc.,* 774 S.W.2d 411, 412 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *Bivens Winchester Corp. v. Poteet,* 720 S.W.2d 659, 661 (Tex.App.—San Antonio 1986, no writ). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles: (1) the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary; and (2) if there is no evidence to support the finding, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Ritchey v. Crawford,* 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ). The failure to find a fact need not be supported by evidence. *Bivens Winchester Corp.,* 720 S.W.2d at 661.

■ In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### A. Cause to Terminate Fletcher's Employment

C & W challenges the legal and factual sufficiency of the evidence to support findings of fact numbers seven, twelve, fifteen, sixteen, seventeen, eighteen, and twenty. In these findings of fact, the trial court found that C & W failed to prove Fletcher was terminated for cause, made misrepresentations to prospective tenants, or made misrepresentations or engaged in any unauthorized activities that were beyond the scope and authority of his employment. The court also found that Fletcher never misrepresented the occupancy rates of the Plaza buildings or misrepresented material facts to prospective tenants, and that Fletcher did not breach the employment contract.

■ In considering C & W's legal sufficiency points, we first consider only the evidence that supports the court's findings. Fletcher stated that when prospective tenants inquired about how much office space had been leased, he referred them to the bank or the person responsible for leasing office space because he was not privy to information regarding the amount of office space that had been leased. Fletcher testified that he never misrepresented the occupancy levels of either the office space or retail space. Fletcher also testified that, during the time he worked on the Plaza project, he did not do any act that he knew to be unauthorized or outside the scope of his

1. C & W's fourth point of error, which challenges the amount of lost wages the trial court awarded, has five subparts: (1) the evidence is insufficient to support the court's findings that C & W did not have cause to terminate Fletcher's employment and did not give written notice; (2) the evidence is insufficient to support the court's finding that Fletcher did not breach the contract by making misrepresentations; (3) the trial court applied the wrong measure of damages; (4) the trial court failed to discount the amount of future lost wages to the date of judgment; and (5) the evidence is insufficient to support the court's finding that Fletcher would have earned no less than $35,000 per year from the time he was fired until retirement.

employment. Fletcher stated that C & W did not give him a reason for termination.

The trial court, as trier of fact, was entitled to believe Fletcher's testimony and disbelieve any evidence to the contrary. *See Welborn Mortgage Corp. v. Knowles,* 851 S.W.2d 328, 332 (Tex.App.—Dallas 1993, writ denied). Indeed, in its findings of fact, the trial court states that it "credits the testimony of plaintiff" that he made no misrepresentations. Fletcher's testimony supports the trial court's findings that C & W did not prove that it had cause to fire Fletcher or that Fletcher made misrepresentations. C & W's legal sufficiency challenge must therefore fail.

■ In determining the factual sufficiency of the evidence to support the court's findings, we consider all the other relevant evidence. Four witnesses who had spoken to Fletcher about leasing retail space in the Plaza project testified that Fletcher told them that the office space was anywhere from fifty to eighty percent leased. But one of the retailers, Rubin, testified that those occupancy percentages had appeared in the newspapers. Allen testified that Fletcher attended meetings at which the participants discussed the amount of office space that had been leased in the Plaza. Allen never heard that sixty percent of the office space had been leased.

The only testimony regarding why Fletcher was fired came from Allen. Allen testified that Fletcher was given a reason for his termination. Allen stated that "[t]he reason Mr. Fletcher was terminated was we had suit brought upon us for misrepresentation." Allen also stated, "In my opinion we terminated Mr. Fletcher based on a lawsuit that was brought against us alleging misrepresentation. And the decision on my recommendation that he be terminated was based on conversations I had with other people."

Simon of D. Simon Fine Jewelers eventually sued C & W over the lease, and Fletcher did testify that Simon's allegations involved Fletcher's conduct. Although Fletcher testified that Simon's allegations involved Fletcher's *conduct,* Fletcher did not testify that the suit involved alleged *misrepresentations* by him. There was no testimony connecting Fletcher's alleged misrepresentations to any of the four retailers whose testimony was presented at trial to the reason for Fletcher's termination.

The trial court could have found that the evidence fell short of proving that Fletcher was fired because Fletcher made misrepresentations. The trial judge, as the trier of fact, was free to believe Fletcher's testimony denying that he made misrepresentations and disbelieve the testimony of the four retailers. The court could have properly concluded that, because Fletcher made no misrepresentations, C & W lacked cause to fire him. Even if the trial court believed the testimony of the retailers, the court could have concluded that there was not enough evidence to prove that Fletcher's statements about the amount of leased office space were untrue when made. Some evidence was presented that the percentages Fletcher may have given were reported in the newspapers. We cannot say that the trial court's findings that C & W did not prove cause for firing Fletcher and did not prove that Fletcher made misrepresentations were contrary to the great weight of the evidence and manifestly unjust.

## B. Written Notice of Termination

In finding of fact number seven, the trial court found that at the time C & W fired Fletcher, it did not provide him with the written notice of termination called for by the employment contract. In point one, C & W challenges the legal and factual sufficiency of the evidence to support this finding.

■ We first consider the evidence in support of the court's finding. Fletcher testified that C & W did not give him written notice of termination. Vanderslice did not give Fletcher a copy of the piece of scratch paper he referred to during the termination meeting; Fletcher had to ask if he could make a copy. The paper stated, "Richard your methodology and manner of doing business is not the same as C & W. In the past you have acted outside the scope of your employment cont." Jay Dee Allen, who was at the termination meeting, admitted at trial that this paper did not state that Fletcher had

been fired or terminated. This evidence is legally sufficient to support the trial court's finding that Fletcher did not receive written notice of termination.

■ In considering the factual sufficiency of the evidence, we examine all the evidence. Fletcher testified that he "asked to make a copy of the little piece of scratch paper that was presented to me—or, was written out, the reason for my termination." C & W contends that this testimony establishes that it gave written notice of termination. C & W also relies on the fact that the contract did not spell out what information the notice needed to include. According to C & W's brief, the words "401K," "legal fees," and "off the top deficit" were issues that needed to be addressed as a result of the termination of Fletcher's employment. This testimony was not presented at trial.

Fletcher testified that the scratch paper was not presented to him until he asked for a copy. On its face, the paper does not state that C & W terminated Fletcher's employment. It merely contains vague complaints about Fletcher's job performance. The piece of scratch paper alone does not contain enough information to notify Fletcher that he was being fired. We cannot say the court's finding that there was no written notice of termination is so contrary to the great weight of the evidence as to be manifestly unjust. The evidence is factually sufficient to support the trial court's finding of fact number seven.

We overrule C & W's first and second points of error and overrule its fourth point of error to the extent that it questions the sufficiency of the evidence to prove that C & W did not terminate Fletcher for cause and without written notice and to prove that Fletcher did not breach the contract.

## DAMAGES

### A. Lost Wages

In a portion of its fourth point of error, C & W contends that the trial court erred in its calculation of damages. Specifically, it asserts that the trial court should have awarded Fletcher lost wages for only two weeks instead of lost wages until he retired.

■ The measure of damages for wrongful discharge of an employee is the present cash value of the contract to the employee if it had not been breached. *Greater Fort Worth & Tarrant County Community Action Agency v. Mims,* 627 S.W.2d 149, 151 (Tex.1982). When an employment contract requires a certain period of notice, the employment may be canceled on shorter notice or upon none at all if the employee is paid wages or salary for the specified notice period. *See Hussong v. Schwan's Sales Enters., Inc.,* 896 S.W.2d 320, 326 (Tex.App.—Houston [1st Dist.] 1995, no writ).

In a case with facts similar to this case, an employer breached an employment contract by refusing to let the employee perform, and the employer never gave the employee thirty days' written notice as required by the contract. *Stolz v. Wells,* 43 S.W.2d 163, 165 (Tex.Civ.App.—Beaumont 1931, no writ). The court of appeals determined that the trial court erred in refusing to give the jury the employer's requested charge concerning the measure of damages. *Id.* at 164. In reversing the judgment, the court of appeals held that the breach of the employment contract acted as constructive notice of termination and that the employee was only entitled to recover thirty days' pay from that date, even though the employer had breached the contract. *Id.* at 165.

■ The correct measure of damages in this case is the value of the employment contract to Fletcher. In determining the value of the employment contract, all clauses must be considered. The contract contained two termination clauses. The first provided for immediate termination upon written notice if there was cause to terminate Fletcher. Under the second clause, C & W could terminate Fletcher for no reason at all if Fletcher was given fourteen days' written notice.

Thus, the actual benefit Fletcher received from the employment contract was a two-week notification before termination. Fletcher did not have a contract for the rest of his natural life, and C & W was not obligated to employ Fletcher for as long as he desired to work. C & W breached the

employment agreement, and Fletcher was then entitled to the benefit of the bargain, fourteen days' notice. The trial court erred in awarding Fletcher lost wages until he retired. Fletcher's damages are limited to two weeks' salary from the day he received constructive notice, *i.e.*, knew he was no longer employed by C & W. *See id.* at 165. It is undisputed that Fletcher knew he was no longer employed by C & W on October 23, 1987, the day Vanderslice told him he was fired.

In another portion of point four, C & W asserts that the evidence is insufficient to support the trial court's finding that Fletcher would have earned no less than $35,000 per year until he retired. C & W also contends, however, that the amount of lost wages it owes Fletcher is $1,346.15, two weeks' pay for a person earning $35,000 per year. Because C & W has thus conceded that Fletcher is entitled to $35,000 per year for purposes of determining the amount of his two weeks' salary, it is unnecessary to consider C & W's contention that Fletcher did not prove he was entitled to $35,000 per year.

We sustain that portion of C & W's fourth point of error that complains the trial court awarded the wrong measure of damages. We reverse that portion of the trial court's judgment awarding Fletcher $218,750.01 in past lost wages, $160,954.85 in prejudgment interest on past lost wages, and $171,048.54 in future lost wages. We render judgment awarding Fletcher lost wages in the amount of $1,346.15. We remand this cause to the trial court with instructions to recalculate prejudgment interest on the lost wages.

Because we have limited the amount of lost wages Fletcher is entitled to recover, we need not consider that portion of C & W's fourth point of error which complains of the trial court's failure to award Fletcher only the present value of future lost wages. Similarly, we need not address C & W's fifth point of error in which C & W contends that the evidence is insufficient to support the trial court's finding that Fletcher would have remained employed at C & W until he retired.

**B. Commissions**

In its sixth point of error, C & W contends that the trial court erred in awarding Fletcher $35,000 in withheld commissions. C & W filed a counterclaim against Fletcher, alleging that Fletcher owed C & W for the costs it incurred defending the "Sylvan lawsuit." C & W asserted that, under a provision in the employment contract, it was entitled to retain Fletcher's commissions to offset its costs. The trial court dismissed C & W's counterclaim on Fletcher's motion for directed verdict. In its findings of fact, the trial court found that C & W withheld $35,000 in commissions from Fletcher.

Because we have upheld the trial court's findings that Fletcher did not make any misrepresentations or engage in any unauthorized act outside the scope of his employment, C & W was not allowed to withhold Fletcher's commissions. Indeed, in its post-submission brief, C & W concedes that, "to the extent the dismissal was without cause, Fletcher would also be entitled to recover the $35,000 in withheld commissions." We overrule C & W's sixth point of error.

**C. Attorney's Fees**

In point seven, C & W argues that the trial court erred in awarding Fletcher $57,000 in attorney's fees because Fletcher is not the prevailing party. The employment contract in this case provided that, in the event of legal action arising out of the agreement, "the prevailing party in any such action or proceeding shall be entitled to recover from the non-prevailing party all reasonable legal fees, costs and expenses incurred." The parties agreed at trial that, if Fletcher was the prevailing party, his reasonable and necessary legal fees were $57,000. We have upheld the trial court's findings regarding the breach of contract; therefore, Fletcher is still the prevailing party and is entitled to recover his legal fees. We overrule C & W's seventh point of error.

**D. Prejudgment Interest on Attorney's Fees**

In its eighth point of error, C & W asserts that the trial court erred in awarding prejudgment interest on Fletcher's attor-

ney's fees. Prejudgment interest is not recoverable on attorney's fees awarded. *See Hervey v. Passero,* 658 S.W.2d 148, 149 (Tex. 1983) (per curiam) (prejudgment interest on attorney's fees contrary to clear language of TEX.REV.CIV.STAT.ANN. art. 5069–1.03); *Berry Property Management, Inc. v. Bliskey,* 850 S.W.2d 644, 670 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.); *McCann v. Brown,* 725 S.W.2d 822, 826 (Tex.App.—Fort Worth 1987, no writ); *see also Enserch Corp. v. Shand Morahan & Co.,* 952 F.2d 1485, 1500 (5th Cir.1992) (contract action where attorney's fees based on TEX.CIV.PRAC. & REM. CODE ANN. § 38.001, prejudgment interest denied); *Law Offices of Moore & Assocs. v. Aetna Ins. Co.,* 902 F.2d 418, 422 (5th Cir. 1990) (*Hervey* specifically extended to awards of attorney's fees under § 38.001); *Falcon Constr. Co. v. Economy Forms Corp.,* 805 F.2d 1229, 1235 (5th Cir.1986) (prejudgment interest is never allowed on awards of attorney's fees).

We conclude that the trial court erred in awarding Fletcher prejudgment interest on his attorney's fees. We sustain C & W's eighth point of error. We reverse that portion of the trial court's judgment awarding Fletcher prejudgment interest on his attorney's fees and render judgment deleting the award of prejudgment interest on the attorney's fees.

### MISCELLANEOUS

In its third, ninth, and tenth points of error, C & W contends that the trial court "erred in entering judgment for Fletcher based on" three different findings. C & W complains of the following three findings: (1) Cushman & Wakefield, Inc. did not raise a defense to Fletcher's claim; (2) Fletcher's termination was not pursuant to the fourteen-day no-cause provision and C & W relied exclusively on the cause provision; and (3) certain waiver provisions in the employment contract were important. C & W does not challenge the sufficiency of the evidence to support these particular findings.

For various reasons, C & W's attack on these findings is immaterial to the outcome of this case. The court's finding that Cushman & Wakefield, Inc. did not raise a de-

fense to Fletcher's claim is immaterial because we have determined that Cushman & Wakefield, Inc. is otherwise liable to Fletcher.

Also, C & W need not challenge the trial court's finding that C & W relied on the cause provision in the contract to fire Fletcher and not the no-cause provision. We have upheld the court's finding that C & W lacked cause to terminate Fletcher's employment and limited Fletcher's damages.

In addition, C & W complains of the trial court's finding that the following portion of paragraph thirteen was an important provision of the contract:

[N]o waiver or modification of this Agreement *or any of its terms* shall be valid unless in writing and duly executed by the party to be charged therewith and *no evidence of any waiver ... shall be offered or received in evidence.... The provisions of this paragraph cannot be waived* except as herein set forth. [Emphasis added by trial court.]

Nothing in the record indicates that either side attempted to prove that any part of the employment contract had been waived or modified. Our decision in this case is not based on any waiver of contract provisions. Because C & W's third, ninth, and tenth points of error attack findings that are immaterial to the controlling issues in this case, we overrule these points. *Reed v. Buck,* 370 S.W.2d 867, 874 (Tex.1963); *In re A.B.B.,* 785 S.W.2d 828, 832 (Tex.App.—Amarillo 1990, no writ).

### CONCLUSION

We reverse the portions of the trial court's judgment awarding Fletcher past and future lost wages and prejudgment interest on his attorney's fees. We render judgment that Fletcher recover $1,346.15 in lost wages and no prejudgment interest on the attorney's fees. We remand the cause to the trial court for recalculation of prejudgment interest on the lost wages. We affirm all other portions of the trial court's judgment.