**Opinion issued August 11, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00856-CV

———————————

**POWER REPS, INC., BOB BERGIN, AND JEFF JACQUIN,**
**Appellants / Cross-Appellees**

**V.**

**CY CATES, POWER REPS INDUSTRIAL, LLC, AND GLOBAL**
**TRANSFORMER SPECIALISTS, INC., Appellees / Cross-Appellants**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 10-DCV-183723**

---

## MEMORANDUM OPINION

Power Reps, Inc., Bob Bergin, Jr., and Jeff Jacquin appeal from a judgment

on a jury verdict that resulted in a net award to Cy Cates, Power Reps Industrial,

LLC, and Global Transformer Specialists, Inc. For clarity and in accordance with

the parties' conventions, we will refer to Power Reps, Inc., as "PRI" and to Global Transformer Specialists as "GTS." We will refer to Power Reps Industrial, LLC, also known as Cy Cates Energy Reps, LLC, as "Industrial." Cates, Industrial, and GTS cross-appeal.

Bergin, Jacquin, and PRI assert 11 issues on appeal: (1) the trial court erred by asking the jury whether a document signed on April 12, 2010, was an agreement, rather than ruling on that issue as a matter of law; (2) the trial court erred by failing to award Bergin, Jacquin, and PRI damages for Cates's breach of the April 12 "agreement," despite the fact that the jury was not asked about such damages; (3) there was no or insufficient evidence to support the jury's verdict that Bergin and Jacquin were fiduciaries of Cates; (4) there was no or insufficient evidence to support the jury's damages findings with respect to Cates's claim for tortious interference with prospective contracts; (5) the trial court erred in awarding damages on the commission split and rent agreement because any such agreement was subsumed in the April 12 "agreement"; (6) there was no or insufficient evidence to support the jury's verdict that PRI converted Cates's property; (7) there was no or insufficient evidence to support the jury's verdict that Bergin and Jacquin engaged in oppressive conduct towards Cates; (8) the attorney's fees awarded to Cates, Industrial, and GTS by the jury were unreasonable and excessive, not properly segregated, and not recoverable because

Cates did not prevail on any claim for which fees are recoverable; (9) the trial court should have disregarded the jury's verdict that PRI was not damaged by Cates's breach of his employment agreement and therefore should have awarded Bergin, Jacquin, and PRI their attorney's fees; (10) the trial court erred in awarding Cates ownership and control of the PRIHouston.com domain, website, and email addresses; and (11) the trial court erred by awarding Cates, Industrial, and GTS prejudgment interest on the jury's "net" award, inclusive of both damages and attorney's fees, and by awarding interest on the awards against Bergin and Jacquin individually.

Cates, Industrial, and GTS respond that Bergin, Jacquin, and PRI waived their issues 1 through 3, 5, and 7 through 10; that all 11 issues lack merit; and that, even if Bergin, Jacquin, and PRI could demonstrate error, they have not demonstrated reversible error with respect to any issue. *See* TEX. R. APP. P. 44.1(a)(1).

Cates, Industrial, and GTS also raise two issues on their cross-appeal: (1) the trial court erred as a matter of law by failing to award Cates the damages found by the jury for Bergin and Jacquin's breach of the April 12 agreement because Cates's breach did not excuse performance by Bergin and Jacquin; and (2) the trial court erred by refusing to award as costs of court the cost of the accounting expert retained by Cates, Industrial, and GTS and the cost of the discovery special master.

We affirm in part, reverse in part, and remand for the trial court to recalculate the correct amounts of prejudgment interest and any offsets between awards.

## Background

### A. Bergin, Jacquin, and Cates do business together

This case arises from a falling-out between Bergin and Jacquin on the one side and Cates on the other side over the management of Power Reps, Inc. PRI, a closely-held Texas corporation, operates as an independent sales representative for a number of manufacturers and distributing companies that sell electrical equipment, parts, and accessories. PRI has two general categories of customers or clients, which it classifies as "utility" or "industrial," depending on the business of that customer or client and the type of customers or clients that it, in turn, serves. Within the "utility" classification, PRI serves two subtypes of customers: (1) "public power" companies, including cooperatives and municipal utilities, and (2) investor-owned utility companies.

PRI has three principal shareholders and officers, each of whom works as a sales representative. Bergin, an original shareholder, serves as PRI's president and handles primarily "public power" accounts. Cates, another original shareholder, is a vice president and serves primarily "industrial" accounts. Jacquin became a shareholder when his company merged with PRI approximately 10 years ago; he is

4

a vice president and serves primarily investor-owned utility accounts. The only other shareholder, Robert E. Bergin, Sr., is retired and inactive in the corporation's affairs. Cates was assisted in his work by another PRI employee, Celine Wilson.

By convention, commissions received by PRI were divided as follows: approximately 70% of each commission went to the salesman or team that generated the sale, and the remainder went to PRI for overhead. At least one document indicates that Bergin, Jacquin, and Cates discussed fixing the split at precisely 70-30 from December 2009 forward, although it does not indicate that they reached an actual agreement.[1]

Cates also owned and controlled Global Transformer Specialists, a company that offered accessories for the types of equipment that PRI sold.[2] Cates was the sole owner, officer, director, and bank signatory of GTS. According to Jacquin, Cates, at his own discretion, used PRI funds to meet GTS's needs and used GTS funds to meet PRI's needs.

---

[1] Cates, GTS, and Industrial argue that this document constitutes a formal agreement. But the document in question, an email from Bergin to Jacquin and Cates, specifically identifies the 70-30 split as an "item[] that need[s] to be voted on." There is no indication in that document that PRI's principals ever voted to formalize the division of commissions.

[2] Although GTS is a party to the suit and a named appellee and cross-appellant, none of the parties' briefs in this Court identifies GTS, explains its origins, or meaningfully explains its relevance to the claims, counterclaims, or defenses raised in this case. The facts herein are therefore drawn from our own review of the record.

**B. The shareholders negotiate their disagreements**

In 2009, PRI found itself unable to make its full payroll on several occasions. Bergin and Jacquin came to believe that the blame for the shortfalls in PRI's finances lay with Cates. Specifically, they believed that Cates was misusing corporate funds and engaging in undisclosed deals with PRI clients, both through GTS and otherwise.

Bergin, Jacquin, and Cates attempted to resolve their differences by negotiating a spin-off of the "industrial" component of PRI's business, to be run by Cates. To that end, they exchanged a series of emails in late March 2010. Cates drafted the first email, proposing "[m]y idea of this spin-off" and suggesting terms for a sale of his PRI shares to PRI, payment of PRI debts, allocation of expenses and income, allocation of clients, separation of the corporate data into two sets, and other terms. Bergin responded, interspersing his own comments amongst Cates's statements, distinguishing them by typing them in an orange font. Cates replied, interspersing additional comments among the existing statements, this time in a bold font. On April 12, 2010, Cates, Bergin, and Jacquin each signed their names to a printed copy of this email chain.

At first, Bergin, Jacquin, and Cates apparently treated the April 12 document as reflecting an agreement among the three of them and began taking actions to divide PRI's existing business between PRI and a new entity to be operated by

Cates. Cates formed a new entity, Power Reps Industrial, LLC, in April 2010 and registered the internet domain name PRIHouston.com in August 2010.

It soon became clear, however, that the parties did not agree on the terms of their agreement. For example, Cates paid for the domain name PRIHouston.com and stated that he intended to use it for Industrial, although Bergin and Jacquin saw the initials "PRI" as capable of referring only to Power Reps, Inc., such that the domain name would cause confusion. In addition, Cates interpreted the document as requiring Bergin and Jacquin to form their own entity, Power Reps Utility, but Bergin and Jacquin did not do so and disputed that they had an obligation to do so. In fact, Bergin and Jacquin maintain that the April 12 document had no binding effect, while Cates maintains that it constitutes an enforceable agreement. Despite these disagreements—and despite Bergin and Jacquin's insistence that the April 12 document was not a contract—Bergin and Jacquin, on one side, and Cates, on the other, each concluded that the other side had breached obligations set forth in the April 12 document.

Meanwhile, when Cates created Industrial, he hired Wilson, who had worked with him at PRI, as an Industrial employee. Wilson began working for Industrial in April or May 2010. She resigned, however, in September 2010 and returned to PRI shortly thereafter. According to Cates, when Wilson left, she took Industrial property with her, including office equipment and confidential

7

information. According to Wilson, however, the property in question all belonged to PRI.

## C. PRI files suit

In September 2010, PRI filed suit against Cates, Industrial, and GTS, alleging breach of fiduciary duty, fraud, conversion, conspiracy to defraud PRI, deceptive trade practices, and against Cates individually for breach of an employment contract with PRI. Cates, Industrial, and GTS countersued PRI and sued as third-party defendants Bergin, Jacquin, and Wilson, alleging breach of contract based on the April 12 document, breach of fiduciary duty, shareholder oppression, conversion, a claim under the Texas Theft Liability Act, tortious interference with prospective and existing contracts, and an equitable claim to the PRIHouston.com domain name and associated email accounts, among other causes of action.

## D. The case proceeds to trial

During discovery, the parties disagreed over the production of certain emails, leading Cates, Industrial, and GTS to file a motion to compel discovery and resulting in the trial court's appointment of a special discovery master. The parties also each retained a forensic accountant to determine the balances, if any, due from each party to each other party. Pursuant to an agreed order, the parties agreed that the accountants would produce a joint report and that the accountants' fees would

be treated as costs of court. In a subsequent Rule 11 agreement, they agreed that the accountants would produce a second, supplemental report and that the accountants' costs would be "total, then split equally between the parties."

In April 2013, after a five-week trial, the trial court presented 60 questions to the jury. Bergin, Jacquin, and PRI made no objections to the jury charge. Cates, Industrial, and GTS objected to the submission of jury Questions 56 through 59, regarding an employment agreement between PRI and Cates, on the ground that no evidence showed the existence of such an agreement.

The first question in the charge asked, "Do you find that the writing of April 12, 2010 constituted an agreement whereby Cy Cates, Bob Bergin, and Jeff Jacquin agreed to divide the business of Power Reps, Inc.?" If the jury answered that the document was an agreement, Questions 2 through 5 asked the jury to determine whether Bergin, Jacquin, or Cates breached the agreement (Question 2), who breached first (Question 3), whether any breach by Cates was excused (Question 4), and the amount of damages to Cates, Industrial, and GTS for any breach by Bergin or Jacquin (Question 5). Question 55 asked,

> Do you find that the April 12, 2010 agreement, if any, permitted Cy Cates to operate and market his business as Power Reps Industrial (now Cy Cates Energy Reps, LLC) and Cy Cates purchased the internet domain "PRIHouston.com" and developed the website with Cy [Cates's] funds in furtherance of that agreement[?]

In response to jury Questions 1 through 3, the jury found that the April 12 document was an agreement, that Bergin, Cates, and Jacquin each breached that agreement, and that Cates breached it first. It then found, in response to jury Questions 4 and 5, that Cates's breach was not excused, but that Cates, Industrial, and GTS were damaged in the amount of $283,000 by Bergin and Jacquin's subsequent breach of the agreement. It also found, in response to Questions 6 through 12, that Cates breached fiduciary duties that he owed to PRI, but Bergin and Jacquin, in turn, breached fiduciary duties that they owed to Cates. In response to Question 55, the jury found that the April 12, 2010 agreement "permitted" Cates to operate and market his business as Power Reps Industrial and that Cates purchased and developed the PRIHouston.com domain name with his own funds in furtherance of that agreement.

The jury further found, in response to Questions 16–28, 34–43, 46–51, and 56–59, that PRI tortiously interfered with prospective and existing contracts of Cates, Industrial, and GTS (Questions 16–21); PRI defamed and disparaged Cates, Industrial, and GTS (Questions 22–28); PRI stole and converted property of Cates, Industrial, or GTS (Questions 34–37); Bergin and Jacquin engaged in oppressive conduct against Cates (Questions 38–40); PRI defrauded Cates, Industrial, or GTS (Questions 41–43); Cates defrauded PRI (Questions 48–49); Cates converted property of PRI (Questions 50–51); PRI breached an agreement regarding

10

distribution of commissions and payment of rent (Questions 46–47); and Cates breached an employment agreement with PRI (Questions 56–59).  It also found, in response to Questions 54 and 60, amounts certain of attorney's fees for both groups of parties.

**E.  The parties' post-trial motions**

Bergin, Jacquin, and PRI filed 16 motions for judgment notwithstanding the verdict, each of which the trial court denied.  Cates, Industrial, and GTS also filed a motion for judgment notwithstanding the verdict, which the trial court denied.  Cates, Industrial, and GTS also asked the trial court to award to them as costs of court the fees of their accounting expert and costs related to the discovery master, but the trial court refused to do so.

The trial court entered judgment on the jury's verdict, but declined to award damages to Cates, Industrial, and GTS for breach of the April 12 agreement on the ground that Cates breached the agreement first.  Bergin, Jacquin, and PRI then moved for a new trial and, while that motion was pending, filed a notice of appeal.  The trial court subsequently entered an amended final judgment, modifying the application of prejudgment interest.  Cates, Industrial, and GTS then filed their own notice of appeal.  Subsequently, Bergin, Jacquin, and PRI amended their motion for new trial, which was overruled by operation of law.

## Immaterial Question: The April 12 Document

In their first issue, Bergin, Jacquin, and PRI argue that the April 12 document is unenforceable as a matter of law and that the trial court therefore erred in submitting a jury question asking whether the document was an agreement. The first question posed to the jury asked whether "the writing of April 12, 2010 constituted an agreement." Instead of submitting this question, Bergin, Jacquin, and PRI argue, the trial court should have ruled as a matter of law that the April 12 document was not a contract or, at most, an unenforceable "agreement to agree." As support, they point to the document's express statement that "[a] letter of intent is necessary to proceed," as well as various terms that the document states "will have to be discussed," that the parties "will need to discuss," or that are simply unclear. In the alternative, if the document is an enforceable agreement, they argue in their second issue that the trial court erred in refusing to make a finding as to their damages from Cates's breach of the agreement.

Cates, Industrial, and GTS respond that Bergin, Jacquin, and PRI waived their first argument—that the document is not an enforceable agreement and that the trial court erred in submitting the issue to the jury—by failing to raise it during the jury charge conference. They also argue that whether the document is a contract is a fact issue for the jury. Finally, Cates, Industrial, and GTS respond

12

that the trial court properly rejected Bergin and Jacquin's request for a damages award because no question on those damages was submitted to the jury.

## A.    Immateriality of jury finding on enforceability of contract

"Whether parties intend to make a contractual agreement is usually a question of fact." *Chapman v. Mitsui Eng'g & Shipbuilding Co., Ltd.*, 781 S.W.2d 312, 316 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *see Scott v. Ingle Bros. Pac. Inc.*, 489 S.W.2d 554, 556 (Tex. 1972); *Henry C. Beck Co. v. Arcrete, Inc.*, 515 S.W.2d 712, 716 (Tex. Civ. App.—Dallas 1974, writ dism'd). "But whether a particular agreement constitutes a valid contract is generally a legal determination that the court must make." *Chapman*, 781 S.W.2d at 316; *see Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 156–157 (Tex. App.—Texarkana 1988, writ denied); *Success Motivation Inst., Inc. v. Jamieson*, 473 S.W.2d 275, 280 (Tex. Civ. App.—Waco 1971, no writ). This well-settled rule is grounded in the logic that "determination of whether a written instrument constitutes a contract or not requires a construction of the instrument, and is therefore addressed to the court and not the jury." *Success Motivation Inst.*, 473 S.W.2d at 280.

When a trial court asks a jury to answer a question of law, the jury's finding on that question is immaterial to the judgment that the trial court should enter. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 394 (Tex. App.—Houston [1st

Dist.] 2013, pet. denied); *Ballesteros v. Jones*, 985 S.W.2d 485, 499 (Tex. App.—San Antonio 1998, pet. denied). Both the trial court and, on appeal, the appellate court should disregard an immaterial jury finding. *Spencer*, 876 S.W.2d at 157; *Fazio*, 403 S.W.3d at 394; *see* TEX. R. CIV. P. 301 (upon motion and reasonable notice, trial court may disregard jury finding if directed verdict was proper or if finding has no support in evidence).

**B.     Waiver of enforceability argument**

Cates, Industrial, and GTS argue that Bergin, Jacquin, and PRI waived their argument that the jury's answer to Question 1 was immaterial by failing to raise it at the charge conference.

Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Id.* To preserve error when the trial court submits or refuses to submit a question or instruction to the jury, the complaining party "must point out distinctly the objectionable matter and the grounds of the objection" before the charge is submitted to the jury. TEX. R. CIV. P. 274; *see* TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 278. A party is not required, however, to object before submission of the jury charge to preserve a complaint that a jury question is

14

immaterial. *Ballesteros*, 985 S.W.2d at 499; *Sunwest Bank of El Paso v. Basil Smith Eng'g Co., Inc.*, 939 S.W.2d 671, 673 n.1 (Tex. App.—El Paso 1996, writ denied).

Throughout the trial, Bergin, Jacquin, and PRI argued to the trial court that the document was not a contract. They were not required to object at the charge conference to preserve their complaint that the jury's answer to Question 1 was immaterial. *Ballesteros*, 985 S.W.2d at 499; *Sunwest Bank of El Paso*, 939 S.W.2d at 673 n.1. Under these facts, we decline to find that they waived the issue for purposes of this appeal.

We also reject Cates, Industrial, and GTS's waiver argument because Cates himself seeks to enforce the April 12 document as a contract and would have us hold that he was entitled to the jury's award of damages for Bergin and Jacquin's breach of the parties' agreement. Cates, Industrial, and GTS base their argument in part on whether the jury found a material breach of the agreement and on whether Bergin and Jacquin demanded performance after Cates's breach. These arguments necessarily require us to determine what responsibilities, if any, the parties bore under the purported agreement.

Finally, throughout trial and in their appellate briefs, the parties have pointed to the April 12 document as defining their respective rights and responsibilities. These rights and responsibilities touch on numerous other issues raised on appeal,

15

including the existence of fiduciary duties, conversion of property, rights to the PRIHouston.com domain name and associated assets, and whether Industrial had prospective contracts with which PRI could have tortiously interfered. We cannot address those issues without first determining whether the April 12 document is a legally-binding contract.

## C.     Enforceability of the April 12 document

Having held that the issue of whether the April 12 document is a contract is properly before us, we turn to the merits. Whether the April 12 document itself was an enforceable contract is a question of law, not a question of fact. *See Chapman*, 781 S.W.2d at 316.

"Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Winchek v. Am. Express Travel Related Servs. Co., Inc.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

"The issue of whether [an] . . . agreement fails for lack of an essential term is 'a question of law to be determined by the court, unless there is ambiguity or unless surrounding facts and circumstances demonstrate a factual issue as to an agreement.'" *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *Ronin v. Lerner*, 7 S.W.3d 883, 888 (Tex. App.—Houston [1st Dist.] 1999, no pet.)). "A binding [agreement] may exist when parties agree upon some terms, understanding them to be an agreement, and leave other terms to be made later." *Id.* (citing *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied)). "When an agreement leaves essential (or material) matters open for future negotiation and those negotiations are unsuccessful, however, the agreement 'is not binding upon the parties and merely constitutes an agreement to agree.'" *Id.* (footnote omitted) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000)). "While Texas courts favor validating transactions rather than voiding them, a court may not create a contract where none exists and generally may not add, alter, or eliminate essential terms." *Id.* at 744–45.

We begin by noting that the signed copy of the April 12 document bears a large number of handwritten comments that are not initialed, dated, or—at least on the face of the document—attributed to any particular author. For example, in several places, "spin-off" is crossed out, and "reorg" is written in. In another, the

17

handwritten words "1.5 yr max" appear next to the statement that Cates would sell his existing shares "once the Bank of America Loan is paid off, and within 1 year," but immediately above the statement, "Power Reps, Inc. continues as normal until effective date of ~~spin-off~~ reorg." We cannot ascertain which statement the handwritten term modifies. In other places, the handwritten comments include statements such as "Bob and Jeff Take Wells Fargo Note. Cy [indecipherable] BOA Note."[3]

In two places, the April 12 document indicates that the parties contemplated a formal "letter of intent" before proceeding with the spin-off or reorganization of PRI. First, the typed text of the email chain includes the statements:

> A letter of intent is necessary to proceed with the spin-off. This letter of intent will be signed by each of the stockholders.

Second, immediately above the principals' signatures appear the handwritten words, "Letter of intent to follow," although "to follow" is crossed out and "Follow" is written in.

The document's material terms are incomplete or, in some instances, wholly absent. For example, the document explicitly states that a letter of intent signed by all shareholders "is necessary to proceed" with the division of PRI's business, but it does not state what terms such a letter of intent must contain. The parties agree

---

[3]      There is no testimony in the record clarifying this statement.

that no such letter was ever signed.  The document includes broad and vague statements that "Expenses (including employees) are split," "Income is split," and "Power Reps, Utility and Industrial must settle the debt to GTS."  It is silent as to how such amounts were to be "split" and as to the amount and nature of the debt in question.  One comment in the document refers to how expenses could be split "[i]f we use 60/40," but there is no indication that the parties actually agreed to that proportion, nor is it clear who would bear each share of such a split.  Rather, the document leaves open the possibility that the parties eventually decided to split income and expenses equally into halves, in proportion to each shareholder's stake in the company, in proportion to the relative contributions of the utility and industrial customers, or in any number of other ways.  But the division of income and expenses is an essential term of the proposed agreement.

The April 12 document also includes multiple statements contemplating further discussion of material terms.  For example, the sixth numbered paragraph states,

> [Typed:] There is a Wells Fargo note from the Buy Out of Westmoreland Engineering in the amount of about $70,000 that will need to be discussed.  I am not sure whose name is on it.  **I don't think I have signed any personal guarantee.  My paying the BOA note off is enough – I think.**  [Handwritten:] Bob & Jeff Take Wells Fargo Note.  Cy [indecipherable] BOA Note.

19

(emphasis in original).  The parties disputed responsibility for the Bank of America note in question, but the parties have not identified any evidence from which we might determine the meaning of the indecipherable portion of the handwriting.

Regarding payment of an unspecified "debt to GTS," the document is similarly imprecise.  Its ninth numbered paragraph reads, in full:

> 9. **Power Reps, Utility and Industrial must settle the debt to GTS.** *******[4] We will need to discuss this one also.  I am willing to look at possibly removing Cy's name from #6 above in exchange for removing PRI Utility from [indecipherable] OR we combined [sic] the two and split 3 ways[.]
> We have been through this several times and you know my feelings on this[.]  I am willing to look at some type of compromise but I still feel this debt is no different [than] monies owed to me[.]

(emphasis in original).   In this paragraph, in particular, we cannot say with certainty who wrote which words, much less which terms, if any, the parties intended to be binding.  On the contrary, the final statement indicates no more than an agreement to "look at some type of compromise."[5]  In addition, this paragraph implies that the parties contemplated combining responsibility for the Bank of

---

[4]    The document contains a series of dots or asterisks of uneven shape and positioning.  Based on the document in the record, we cannot tell whether these dots are typed or handwritten, nor can we determine their original color.  Similar dots appear in several of the paragraphs in the document, but it is not clear from the record what they signify, if anything.

[5]    The only reference to this term that we have found in the record is Jacquin's testimony that Cates "believed that monies were owed to GTS from Power Reps. . . . [b]ecause that's what he felt."

America loan with responsibility for other debts, casting further doubt on who bore responsibility for the former.

Likewise, the parties discussed the question, "How will we split data information or programs?" The response to that question, printed in bold font, was,

> I'm discussing the options with programmers. I suggest we operate 2 separate databases. Migrating data to each. The existing server should handle both. Password protection will control access to each. We can determine what data to migrate examples: (all customer TEC, all customer Centerpoint, etc.) This could apply to contacts and transactions. Another possibility is we each sign a confidentiality agreement and migrate all data to both databases. All new information will be limited.

Again, we cannot determine what the parties agreed to with respect to data or software ownership, if anything. But the division of these assets was a material term of the proposed agreement; the document itself reflects that the parties held significant concerns about access and confidentiality, and even the parties' appellate briefs reflect a focus on ownership and confidentiality of data.

Because the April 12 document does not contain essential terms of the parties' purported agreement, it is unenforceable as a matter of law. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Oakrock Exploration Co.*, 87 S.W.3d at 691. The document is not legally binding for the additional reason that it is not sufficiently definite to enable us to understand what each party promised to do. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221. Finally, the parties' signatures

notwithstanding, the document reflects that there was no "acceptance in strict compliance with the terms of the offer" because the responses expressed ongoing disagreement and uncertainty regarding various terms. *See Winchek*, 232 S.W.3d at 202. The document does not evince a "meeting of the minds" as to numerous material terms because the text of the document contains incompatible proposals, with no indication of which terms form the parties' agreement. *Id.* For each of these reasons, the document is not enforceable as a contract. *See id.* We therefore sustain Bergin, Jacquin, and PRI's first issue and hold that the trial court erred in entering judgment on the jury's answer to Question 1, rather than disregarding it as an immaterial finding on a question of law.[6]

Bergin, Jacquin, and PRI's second issue addresses whether the trial court should have determined the amount of damages due for Cates's breach of the

---

[6] Cates, Industrial, and GTS argue in a footnote, "Should this Court find error, [Bergin, Jacquin, and PRI] fail to demonstrate reversible error," citing Texas Rule of Appellate Procedure 44.1(a)(1). They reiterate this same argument, always in footnotes and using exactly the same language, regarding each of the eleven issues raised by Bergin, Jacquin, and PRI. They do not elaborate on these arguments with any citations to other authority, the record, or any briefing whatsoever. Cates, Industrial, and GTS have thus not raised any particular issue or argument with respect to reversible error. *See* TEX. R. APP. P. 38.1(i) ("The [appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."), 38.2(a)(1) ("An appellee's brief must conform to the requirements of Rule 38.1," with exceptions not relevant here.). We have, however, considered and applied the reversibility requirements set forth in Rule of Appellate Procedure 44.1 to each issue raised by the parties. *See* TEX. R. APP. P. 44.1.

22

purported April 12 agreement and entered judgment in that amount. Because we hold that the April 12 document is not an enforceable contract, we overrule that issue as moot.

## Evidentiary Sufficiency

We now turn to Bergin, Jacquin, and PRI's evidentiary sufficiency issues, namely their issues three through seven and nine.

### A. Standard of review

When we consider whether legally sufficient evidence supports a challenged finding, we must consider evidence that supports the finding if a reasonable factfinder could do so, and we must disregard contrary evidence unless a reasonable factfinder could not do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We may not sustain a legal insufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

"When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of

the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Vill. Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 124 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A no-evidence argument is an attack on the legal sufficiency of the evidence and must be preserved for appeal through (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or (5) a motion for new trial. *T.O. Stanley Boot Co.*, 847 S.W.2d at 220. Similarly, a factual-sufficiency argument must be preserved by a motion for new trial. TEX. R. CIV. P. 324(b).

## B. Fiduciary duties

In their third issue, Bergin, Jacquin, and PRI argue that there is no or legally insufficient evidence to support the jury's verdict that Bergin and Jacquin are fiduciaries of Cates. Specifically, they argue that the evidence is insufficient for three reasons: (1) "the underlying facts are undisputed," making the existence of a fiduciary duty a question of law; (2) Bergin and Jacquin's actions relevant to this case were all taken in their capacities as directors and officers of PRI; and (3) the economic loss rule bars any recovery by Cates for Bergin and Jacquin's breach of their fiduciary duties.

Cates, Industrial, and GTS respond that Bergin, Jacquin, and PRI waived this issue by failing to raise it at the jury charge conference. In the alternative, they argue that sufficient evidence supports the judgment.

### 1.    *Waiver*

A party may preserve a legal-sufficiency issue through a motion for instructed verdict, an objection to submission of an issue to the jury, a motion for a judgment notwithstanding the verdict, a motion to disregard the jury's answer to a vital fact issue, or a motion for a new trial. *Salinas v. Fort Worth Cab & Baggage Co., Inc.*, 725 S.W.2d 701, 704 (Tex. 1987); *see Williams v. S. Pac. Transp. Co.*, 804 S.W.2d 132, 134 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Bergin, Jacquin, and PRI filed a motion to disregard the jury's findings regarding Bergin and Jacquin's fiduciary duties to Cates. They have thus preserved this issue.

### 2.    *Existence and breach of fiduciary duty*

"The elements of a breach-of-fiduciary-duty claim are (1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of the fiduciary duties arising from that relationship; and (3) injury to the plaintiff, or benefit to the defendant, resulting from that breach." *Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied).

"A fiduciary duty is an extraordinary duty that is not lightly created." *Wayne Duddlesten, Inc. v. Highland Ins. Co.*, 110 S.W.3d 85, 96 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 301 (Tex. App.—El Paso 1996), *aff'd on other grounds*, 966 S.W.2d 482 (Tex. 1998). Thus, fiduciary duties arise only out of certain special relationships. *See, e.g.*, *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007); *J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.*, 302 S.W.3d 515, 536 (Tex. App.—Austin 2009, no pet.). "In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of law." *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). Texas courts "also recognize an informal fiduciary duty that arises from 'a moral, social, domestic or purely personal relationship of trust and confidence.'" *Id.* (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). Cates argues that an informal fiduciary relationship existed between him and Bergin and Jacquin.

"A [corporate] director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." *Richardson v. Newman*, 439 S.W.3d 538, 542 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. App.—Houston [1st Dist.] 2009, pets. denied)). "While corporate officers owe fiduciary

26

duties to the corporation they serve, they do not generally owe fiduciary duties to individual shareholders *unless a contract or confidential relationship exists between them in addition to the corporate relationship.*" *Somers*, 295 S.W.3d at 11 (quoting *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied) (emphasis added)). Further, the relationship between shareholders in a closely-held corporation, taken alone, does not give rise to fiduciary duties. *Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 n.1 (Tex. 2014).

When the underlying facts are undisputed, the determination of whether a fiduciary relationship exists is a question of law for the court. *Meyer*, 167 S.W.3d at 330; *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 627 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Thus, "[a]lthough the existence of facts giving rise to a fiduciary duty is a question for the factfinder's determination, the issue of whether those facts give rise to a formal fiduciary relationship is a question of law." *Envtl. Procedures*, 282 S.W.3d at 627; *see Brewer & Pritchard, P.C. v. Johnson*, 7 S.W.3d 862, 867 (Tex. App.—Houston [1st Dist.] 1999), *aff'd*, 73 S.W.3d 193 (2002).

We consider a variety of factors to determine whether an informal fiduciary relationship exists. *Gregan v. Kelly*, 355 S.W.3d 223, 228 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Our first consideration is the nature of the parties'

relationship. *Id.*; *see Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) ("The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved."); *Lee v. Hasson*, 286 S.W.3d 1, 14–16 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (analyzing (1) parties' closeness, including whether relationship is close personal friendship or close business relationship, (2) whether parties' transactions were conducted at arm's length, and (3) terms of any contracts between parties). As part of the parties' relationship, we must consider whether the purported fiduciary exercised dominance and undue influence over the other party. *See R.R. St. & Co., Inc. v. Pilgrim Enters., Inc.*, 81 S.W.3d 276, 306 (Tex. App.—Houston [1st Dist.] 2001) ("[F]iduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other"), *rev'd in part sub nom.*, 166 S.W.3d 232 (Tex. 2005).[7] We also consider the length of the parties' relationship, although a long personal relationship alone is insufficient to create a fiduciary relationship. *Lee*, 286 S.W.3d at 15; *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—

---

[7] *See also Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998) ("[T]he law recognizes the existence of confidential relationships in those cases 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992))); *Pope v. Darcey*, 667 S.W.2d 270, 275 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("A confidential relationship exists where one person has a special confidence in another to the extent that the parties do not deal with each other equally, either because of dominance on one side or weakness, dependence, or justifiable trust on the other.").

Houston [14th Dist.] 1997, pet. denied) (observing that long personal relationship alone is insufficient to create fiduciary relationship).

A second factor is whether the plaintiff actually relied on the purported fiduciary "for moral, financial, or personal support or guidance." *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex. App.—Amarillo 2002, no pet.); *see Lee*, 286 S.W.3d at 15. Third, we examine whether such reliance is justifiable. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (stating informal fiduciary relationship "may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"); *Thigpen*, 363 S.W.2d at 253 ("[W]e hold that in this case there is not such evidence of justifiable trust and confidence as will create a fiduciary relationship"); *Gregan*, 355 S.W.3d at 228 ("[O]ne factor we consider is whether party claiming to be owed a fiduciary relationship justifiably placed special confidence in the other party to act in his best interest.").

In addition to these factors, there is one bright-line temporal requirement that must be satisfied to establish an informal fiduciary relationship: "[t]o impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Meyer*, 167 S.W.3d at 331; *Wayne Duddlesten, Inc.*, 110 S.W.3d at 96; *see Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

29

Applying these factors, we first consider the nature of the relationship between Bergin, Jacquin, and Cates. *Gregan*, 355 S.W.3d at 228; *see Thigpen*, 363 S.W.2d at 253; *Lee*, 286 S.W.3d at 14–16. The record does not contain any agreement, whether written or oral, that creates an informal fiduciary relationship. The record shows that these men had a long-standing relationship spanning more than 20 years. That relationship, however, began with and centered on the management and eventual breakup of PRI. No evidence indicates that the relationship was especially close or intimate such that it might rise to the level of an informal fiduciary relationship. *Cf. Lee*, 286 S.W.3d at 14–16 (evidence of long-standing business relationship and personal friendship in which parties vacationed together with their families was legally and factually sufficient to support jury's finding of informal fiduciary relationship); *Flanary v. Mills*, 150 S.W.3d 785, 794 (Tex. App.—Austin 2004, pet. denied) (legally and factually sufficient evidence existed that shareholder in homebuilding corporation had confidential relationship with corporation's other shareholder who was both his uncle and former partner in another business). Further, nothing in the record indicates that the purported fiduciaries—Bergin and Jacquin—exercised dominance and undue influence over Cates. *See R.R. St. & Co.*, 81 S.W.3d at 306. This first factor therefore does not support the existence of an informal fiduciary relationship.

We next look at whether Cates actually relied on Bergin and Jacquin "for moral, financial, or personal support or guidance." *Trostle*, 77 S.W.3d at 915; *see Lee*, 286 S.W.3d at 15. No evidence indicates that he did. Rather, the three men operated somewhat independently, and it was Cates, not the others, who eventually opted to leave PRI and operate his business independently. This second factor does not support the existence of a fiduciary relationship. The absence of support for this factor also renders the third factor—whether Cates's reliance is justifiable—inapplicable.

Finally, we note that "the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Meyer*, 167 S.W.3d at 331; *see Schlumberger*, 959 S.W.2d at 177. No evidence indicates that the parties had such a special relationship that pre-dated the purported agreements at issue in this suit.

We hold that, as a matter of law, the evidence does not support the jury's finding that Bergin and Jacquin were fiduciaries of Cates.[8] We sustain Bergin,

---

[8] We note that the jury awarded damages to PRI for Cates's breach of a fiduciary duty. No party challenges that award or the jury's liability findings underlying the award. We note, however, that the award to PRI is based on a different theory—Cates's relationship to PRI—than that supporting Cates's recovery against Bergin and Jacquin and is therefore not affected by our holding here.

Jacquin, and PRI's third issue[9] and reverse the trial court's awards of damages for breach of fiduciary duties by Bergin and Jacquin.[10]

## C.    Tortious interference with prospective contracts

Bergin, Jacquin, and PRI argue in their fourth issue that no or insufficient evidence supports the jury's liability finding and damages award to Cates, Industrial, and GTS for tortious interference with prospective contracts in response to jury Questions 16 and 18.  Therefore, according to Bergin, Jacquin, and PRI, the trial court should have disregarded the jury's findings relevant to that claim.

Bergin, Jacquin, and PRI do not cite any authority in connection with their fourth issue.  They do not identify the elements of a claim for tortious interference with prospective business relations, nor do they explain which element or elements of the claim are supported by insufficient evidence.[11]  Because Bergin, Jacquin,

---

[9]    Because we sustain this issue based on Bergin, Jacquin, and PRI's first two arguments, we do not reach their arguments regarding the economic loss rule.

[10]    The trial court awarded these damages in two apparently overlapping portions.  In paragraph 13 of the judgment, it awarded $281,000, the amount found by the jury, against "Bergin . . . jointly and severally with . . . Jacquin."  Then, in paragraph 14 of the judgment, it awarded 40% of that amount to "Jacquin, jointly and severally with . . . Bergin."  We reverse both awards, as both depend on the same liability findings.

[11]    We also note that, contrary to PRI's position, a claim for tortious interference with prospective business relations does not necessarily require proof of a prospective contract; it may instead involve interference with a continuing relationship that has not been reduced to a formal contract.  *See, e.g.*, *Heil–Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex.

32

and PRI have inadequately briefed this issue, they have waived it. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see also, e.g.*, *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Moreover, to the extent that Bergin, Jacquin, and PRI raise any complaint regarding the jury charge's question on liability, they waived it by failing to object at the jury charge conference. *See* TEX. R. CIV. P. 272, 274.

With respect to damages, Bergin, Jacquin, and PRI assert that "the evidence shows clearly that Cates suffered no damage from any actions or conduct by PRI, Bergin or Jacquin that interfered with [his] business relations or 'contracts.'" This briefing is inadequate in that it fails to identify legal authority relevant to the applicable standard of review, the law of tortious interference, or damages. It does not identify the evidence that "shows clearly that Cates suffered no damage" due to their actions. Nor do Bergin, Jacquin, and PRI discuss, in either their opening brief or their reply brief, the evidence to which Cates points as support for the tortious interference finding: disparaging remarks by Bergin, Jacquin, and PRI to Cates's

---

App.—Houston [14th Dist.] 1993) (citing RESTATEMENT (SECOND) OF TORTS § 766B, cmts. a, c (1979)), *writ granted w.r.m.*, 877 S.W.2d 300 (Tex. 1994); *see also Faucette v. Chantos*, 322 S.W.3d 901, 915 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

actual and potential customers, meetings between Wilson and Cates's actual customer Olsun, and PRI's attempt to have a commission check payable to Industrial reissued and made payable to PRI. By failing to brief their complaint by addressing neither the relevant law nor the evidence, Bergin, Jacquin, and PRI have waived this issue. *See* TEX. R. APP. P. 38.1(i).

We hold that Bergin, Jacquin, and PRI have waived their fourth issue.

**D.     Commission-split and rent agreement**

In their fifth issue, Bergin, Jacquin, and PRI argue that the trial court should have disregarded the jury's findings regarding the purported 70-30 commission-split and rent agreement. In support, they make two arguments: (1) "any agreement relating to commission split and payment of rent was subsumed in the incomplete April 12, 2010 agreement draft which the jury found Defendant Cates breached first," and (2) there is no evidence or legally insufficient evidence that PRI did not comply with its obligations "under an alleged agreement to make commission payments."

Bergin, Jacquin, and PRI again cite no legal authority in connection with this issue. They do cite to the record, but their record references do not support their argument that the parties intended that the April 12 document would supersede the purported commission-split and rent agreement, nor do they demonstrate that Cates received all monies that he claimed under that agreement. We also note that their

briefing regarding the purported commission-split and rent agreement in the trial court, like their briefing here, fails to cite any legal authorities supporting the argument that the agreement had been superseded or subsumed into any other agreement. Finally, we note that the April 12 document—which we have already held was not a binding contract—does not contain a merger clause or other indication that the parties intended it to supersede any prior agreements. Bergin, Jacquin, and PRI do not articulate any argument as to why we should construe it as having such an effect, even assuming that it was binding.

Because Bergin, Jacquin, and PRI do not cite legal authority or evidence to support their fifth issue, we overrule it as inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Tesoro Petroleum*, 106 S.W.3d at 128.

## E. Conversion

In their sixth issue, Bergin, Jacquin, and PRI argue that there is no or insufficient evidence to support the jury's liability finding and damages award, in response to jury Questions 34 and 35, for PRI's conversion of property belonging to Cates, Industrial, or GTS. They contend that, when the disputed property is money, an action for conversion is generally inappropriate, citing *Edlund v. Bounds*, 842 S.W.2d 719 (Tex. App.—Dallas 1992, writ denied). According to Bergin, Jacquin, and PRI, the evidence showed that all funds or property to which

Cates was entitled were either released to Cates or credited against amounts that he owed to PRI.

Cates, Industrial, and GTS respond that the jury could have found that PRI converted computer and phone equipment, confidential information, and commissions that Cates and Industrial earned and that were received and wrongfully withheld by PRI.

"Conversion is the wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Lee v. Lee*, 411 S.W.3d 95, 108–09 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Burns v. Rochon*, 190 S.W.3d 263, 267–68 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

> To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property.

*Lee*, 411 S.W.3d at 109. "An action for the conversion of money will lie if the money can be identified as a specific chattel." *Edlund*, 842 S.W.2d at 727 (citing *Eckman v. Centennial Sav. Bank*, 757 S.W.2d 392, 398 (Tex. App.—Dallas 1988, writ denied)). But "[w]hen an indebtedness can be discharged by payment of

36

money generally, an action in conversion is inappropriate." *Id.* (quoting *Eckman*, 757 S.W.2d at 398).

Jury Question 34 asked whether "[PRI], Bergin, and/or Jacquin convert[ed] property belonging to Cy Cates individually, [Industrial], and/or [GTS]." The accompanying instructions properly instructed the jury regarding the elements of conversion, although they did not distinguish between personal property and money. Instead, the instructions defined "personal property" to include "items ordinarily considered to be personal property (e.g. cars, jewelry), in addition to confidential information, such as customer lists and trade secrets, and money, including bank deposits and rental proceeds." They did not define "confidential information" or "trade secrets."

The record does not contain any evidence that Cates, Industrial, or GTS had any right to computer and phone equipment or confidential information that they obtained from PRI. Rather, their claims to such equipment and information are premised on the purported terms of the parties' agreement to split PRI into two entities. But, as we have already held, no legally-binding agreement exists. As for commissions that Cates and Industrial earned, the parties make no attempt to identify that money as associated with a particular chattel. An action for conversion of that money is therefore inappropriate. *See Edlund*, 842 S.W.2d at 727 (quoting *Eckman*, 757 S.W.2d at 398).

We hold that the record contains legally insufficient evidence that PRI converted any property of Cates, Industrial, or GTS. We therefore sustain Bergin, Jacquin, and PRI's sixth issue.

## F.  Oppressive conduct

Bergin, Jacquin, and PRI contend in their seventh issue that there is no or insufficient evidence to support the jury's liability finding and damages award for Bergin and Jacquin's oppressive conduct against Cates. They contend that they took all of the allegedly oppressive actions in their capacities as officers and directors of PRI, not as individuals, and that such actions were proper.

Cates, Industrial, and GTS argue that Bergin, Jacquin, and PRI failed to raise this issue in the trial court and thus did not preserve it for appeal. Although PRI's initial motion for new trial challenged the sufficiency of the evidence regarding oppressive conduct, Bergin and Jacquin did not join that motion. They did, however, join PRI's amended motion for new trial after the trial court amended its judgment. They have therefore preserved their legal-sufficiency argument on oppressive conduct for purposes of appeal. *See* TEX. R. CIV. P. 324(b); *T.O. Stanley Boot Co.*, 847 S.W.2d at 220.

On appeal, however, they have waived this issue by inadequate briefing. Bergin, Jacquin, and PRI do not cite any evidence in support of their argument other than testimony that PRI held a board meeting to which Cates was invited.

They cite only three cases in support of their arguments, all of which have been overruled or disapproved by the Supreme Court of Texas. *See Willis v. Donnelly*, 118 S.W.3d 10 (Tex. App.—Houston [14th Dist.] 2003), *overruled in part*, 199 S.W.3d 262, 279 (Tex. 2006); *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), *disapproved by Ritchie v. Rupe*, 443 S.W.3d 856, 870–71 n.17 (Tex. 2014); *Davis v. Sheerin*, 754 S.W.2d 375, 383 (Tex. App.—Houston [1st Dist.] 1988, writ denied), *disapproved by Ritchie*, 443 S.W.3d at 876. Moreover, these cases do not support the proposition for which Bergin, Jacquin, and PRI argue: that, as a matter of law, a shareholder of a closely-held entity does not oppress another shareholder, so long as he acts solely in an official capacity to carry out the allegedly oppressive acts.

We hold that Bergin, Jacquin, and PRI have waived their seventh issue.

## G. Employment agreement

In their ninth issue, Bergin, Jacquin, and PRI argue that no or insufficient evidence supports the jury's award of zero damages for Cates's breach of his employment agreement with PRI and that the trial court therefore erred in denying PRI attorney's fees on that claim. The jury found that Cates breached his employment agreement, but it awarded no damages for that breach. Although the jury awarded attorney's fees to PRI, the trial court did not award those fees in the

judgment because PRI did not recover damages on its breach-of-contract claim related to the employment agreement.

Bergin, Jacquin, and PRI do not cite to any authority in support of their argument. More significantly, they also do not cite to any relevant evidence. In fact, they do not cite to or identify the employment agreement or its terms. Rather, they cite only to expert testimony regarding damages caused by Cates's actions generally. They do not explain how any action by Cates breached any term of the alleged employment agreement or explain what damages suffered by PRI are attributable to any such breach.

Given their failure to identify the employment agreement, its terms, or any relevant authority, we hold that Bergin, Jacquin, and PRI have waived their ninth issue by inadequately briefing it. *See* TEX. R. APP. P. 38.1(i); *Tesoro Petroleum*, 106 S.W.3d at 128.

### Attorney's Fees

In their eighth issue, Bergin, Jacquin, and PRI challenge the trial court's award of attorney's fees to Cates, Industrial, and GTS. They contend that (1) the fee amounts awarded by the jury were unreasonable and excessive; (2) Cates, Industrial, and GTS did not segregate their attorney's fees between claims for which fees are recoverable and those for which they are not; and (3) Cates either did not recover or should not have recovered on each claim for which fees are

recoverable. Cates, Industrial, and GTS argue that Bergin, Jacquin, and PRI waived this issue by failing to raise it in the charge conference or when the evidence of fees was presented.

The following comprises the entirety of the briefing on Bergin, Jacquin, and PRI's first two arguments:

> The Court erred in failing to disregard the jury's answers to Question No 54 and in awarding attorney fees to Defendants Cates, Power Reps Industrial, LLC, (now Cy Cates Energy Reps, LLC) and Global Transformer Specialists, Inc. for the reasons that
>
> (a)    the fee amounts found by the jury were unreasonable and excessive relative to any respective claims upon which Defendants could have been entitled to recover attorney fees; [and]
>
> (b)    Defendants' [sic] failed to segregate its [sic] claims for attorney fees for any respective claim on which Defendants sought to recover attorney fees[.]

Bergin, Jacquin, and PRI do not cite or refer to any authority or evidence to support these arguments. We therefore hold that they have waived these points. *See* Tex. R. App. P. 38.1(i); *Tesoro Petroleum*, 106 S.W.3d at 128.

In their third argument, Bergin, Jacquin, and PRI attack each basis on which Cates, Industrial, and GTS could have recovered attorney's fees. Specifically, they contend that the jury's finding that Cates breached the April 12 "agreement" undermines recovery on that basis. They also insist that the trial court should have disregarded the jury's finding on Cates, Industrial, and GTS's theft claim because

the only evidence of any theft was that Cates stole property from PRI. Finally, they assert that the trial court should have disregarded the jury's finding that PRI breached the purported 70-30 commission-split and rent agreement.

Bergin, Jacquin, and PRI have waived this third argument, as well. They again fail to cite any authority in support of their contentions. Their only citations to the record are to demonstrate purported bad acts by Cates, not to demonstrate the absence of evidence supporting any portion of the judgment regarding a cause of action for which fees are recoverable. We therefore hold that they have waived their third attack on the attorney's fees award by inadequately briefing it. *See* TEX. R. APP. P. 38.1(i); *Tesoro Petroleum*, 106 S.W.3d at 128.

Because Bergin, Jacquin, and PRI have waived their eighth issue, we overrule it.[12]

---

[12] We note that Bergin, Jacquin, and PRI raise a fourth argument under the heading of "Argument on Point of Error Eight:" that the trial court should have disregarded the jury's award of zero damages for Cates's breach of his employment agreement. This point, however, has nothing to do with the trial court's award of attorney's fees to Cates, Industrial, and GTS, as those parties cannot recover fees in connection with that claim. *See 1/2 Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W.3d 378, 383 (Tex. 2011) (explaining that TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 establishes "one-way fee shift," under which defendant is liable for successful plaintiff's fees in breach-of-contract action, but reverse is not true). Indeed, Bergin, Jacquin, and PRI do not mention fees in connection with this point. Rather, the argument focuses entirely on damages connected to the employment agreement. We have therefore considered this argument in connection with Bergin, Jacquin, and PRI's ninth issue, addressed above.

**Declaratory Judgment Regarding PRIHouston.com and Associated Assets**

In their tenth issue, Bergin, Jacquin, and PRI contend that the trial court erred in declaring that Cates owns the domain name PRIHouston.com and the associated website and email addresses. Specifically, they argue that these assets are indelibly associated with and are property of PRI, and "[t]here is no legal or equitable basis for the [trial court's] judgment awarding [these assets] to Defendants." They continue, "The use of those names or marks by Defendants is certain to promote confusion as to the source, endorsement, affiliation or sponsorship of the user company and/or its products, and will damage Plaintiff Power Reps, Inc." In conclusion, they contend,

> The use of the internet domain, website or the name 'PRIHouston' is and will be unfair competition per se, will be an identifying mark that is deceptively similar to the business name and internet presence of Plaintiff, Power Reps, Inc., will be confusing to the business relations, clients and customers of Plaintiff, is error and must be set aside."

Declaratory judgments are authorized by Section 37.003 of the Civil Practice and Remedies Code, which provides, "A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a) (West 2015). A trial court's decision to enter or refuse a declaratory judgment rests within the sound discretion of the trial court. *See, e.g.*, *Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co., Inc.*, 794 S.W.2d 944, 947 (Tex. App.—Houston [1st

43

Dist.] 1990, no pet.). A trial court abuses its discretion if it "rule[s] arbitrarily, unreasonably, or without regard to guiding legal principles." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

Bergin, Jacquin, and PRI do not provide any citations to the record in support of their contentions, nor do they cite any authorities regarding the nature of declaratory judgments or the applicable standard of review. The four cases that they do cite all address either the law of unfair competition, which is not at issue in this case, or the "four corners" rule of interpretation of contracts. None of these cases provides any basis for overturning the trial court's declarations.

First, Bergin, Jacquin, and PRI rely on *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir. 1998), for the proposition that the trial court's judgment "merely establishes a basis and opportunity for use by Defendants to unfairly compete with the now separate business entities." They do not cite to any particular portion of the Fifth Circuit's thirty-page opinion in *Pebble Beach* as authority for their contentions. Moreover, *Pebble Beach* has since been partially abrogated by the Supreme Court of the United States. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 121 S. Ct. 1255 (2001), *partially abrogating Pebble Beach*, 155 F.3d 526, *as recognized by Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 544–45 (5th Cir. 2015). Unlike *Pebble Beach*, this case does not involve any claims of unfair competition, nor do the parties' disputes

44

over the PRIHouston.com domain name and related assets center on the likelihood of confusion among the public. Rather, those disputes turn on the parties' respective claims to ownership and control of those assets in the first place. We find no support in the since-abrogated *Pebble Beach* opinion for Bergin, Jacquin, and PRI's argument that Cates's ownership of the PRIHouston.com domain and associated assets nonetheless depends on the law of unfair competition. *Pebble Beach* has no bearing on this case.

Bergin, Jacquin, and PRI then argue that the "four corners" rule, as applied to the April 12 document, precludes a finding that the document gave Cates ownership or control rights over the assets in question. As support, they provide their three remaining citations to authority in connection with this issue, each of which simply states the "four corners" rule: *Lakin Enters. v. Sebastian*, No. 05-08-00213-CV, 2009 WL 428491 (Tex. App.—Dallas Feb. 23, 2009, no pet.) (no pin cite provided); *P. Bordages–Account B, L.P. v. Air Prods., L.P.*, 127 F. App'x 724 (5th Cir. Apr. 15, 2005) (no pin cite provided); and *P. Bordages–Account B, L.P. v. Air Prods., L.P.*, 369 F. Supp. 2d 860 (E.D. Tex. 2004) (no pin cite provided). We agree with Bergin, Jacquin, and PRI that the April 12 document does not mention the PRIHouston.com domain name or associated assets and that the document is not enforceable as a contract. It therefore does not explicitly confer upon Cates any ownership or rights to control the assets at stake.

Our inquiry does not end there, however, as the rights conferred by the April 12 document are not the only bases upon which the trial court could have rendered its judgment. Jury Question 55 asked:

> Do you find that the April 12, 2010 agreement, if any, permitted Cy Cates to operate and market his business as Power Reps Industrial (now Cy Cates Energy Reps, LLC) and Cy Cates purchased the internet domain "PRIHouston.com" and developed the website with Cy Cates' funds in furtherance of that agreement[?]

The judgment stated simply, "Cy Cates is awarded full and exclusive right, custody, use, and control of [the] PRIHouston.com website, domain, webpage, and associated email accounts."

In other words, neither Question 55 nor the judgment depended on rights expressly conferred by the April 12, 2010 document. Rather, the jury was asked whether it "permitted" Cates to take certain actions, including purchasing the PRIHouston.com domain name and developing the associated website.

It is undisputed that Cates purchased the PRIHouston.com domain name, using his personal credit card, in August 2010, months after execution of the April 12, 2010 document. The document does not mention that domain name, nor does it prohibit Cates from using any particular names or marks in marketing and promoting Industrial. The jury's finding thus is compatible with the evidence: in the absence of an enforceable agreement in the April 12 document prohibiting Cates's actions, and given testimony that Cates attempted to act consistently with

46

that document in registering the domain name, there is evidence that the document "permitted" his actions and that he acted "in furtherance of" the purported agreement.

Bergin, Jacquin, and PRI make no attempt to show that the trial court abused its discretion by granting declaratory relief. They do not cite the Uniform Declaratory Judgments Act or any standard of review. Instead, they simply argue that (1) the April 12 document does not support the declaration and (2) the declaration will promote unfair competition. But as we have already observed, neither jury Question 55 nor the trial court's judgment was expressly based on rights conferred by the April 12 document. Rather, the question posed to the jury was whether the document "permitted" his actions, and the jury's affirmative finding is not inconsistent with the evidence. As to the second argument, unfair competition was not a cause of action or defense in this case, and the trial court was not required to address questions of unfair competition in order to enter judgment on the jury's verdict regarding ownership of the disputed assets.

We hold that Bergin, Jacquin, and PRI have failed to show that the trial court abused its discretion in granting declaratory relief to Cates. We therefore overrule their tenth issue.

## Cates, Industrial, and GTS's Cross-Appeal

### A.  Damages for breach of the April 12 agreement

Cates, Industrial, and GTS argue in their first issue on cross-appeal that the trial court erred by failing to award damages of $283,000 for Bergin and Jacquin's breach of the April 12, 2010 document, as found by the jury in response to Question 5.  They contend that, because Bergin, Jacquin, and PRI did not raise Cates's prior material breach of that document as an affirmative defense, it was error for the trial court to apply that breach as a bar to recovery.  We do not reach those arguments because the April 12, 2010 document is not an enforceable contract.  We therefore overrule the first cross-issue as moot.

### B.  Expert witness fees and costs related to special master

We now turn to Cates, Industrial, and GTS's second and final issue, which has the potential to affect the amounts recoverable under the judgment, before turning to the calculation of interest on those amounts.  First, Cates, Industrial, and GTS argue that the trial court erred in refusing to award as costs their accountant's fees, to which they claim they were entitled for "good cause" shown under Rule of Civil Procedure 141 by virtue of a pair of Rule 11 agreements.  Second, they argue that they were entitled to an award of expenses related to the discovery special master.  Bergin, Jacquin, and PRI respond to both arguments that such costs were

not recoverable and, to the extent that the trial court had discretion to award them, it did not abuse that discretion.

"The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131. "'Costs,' when used in legal proceedings, refer not just to any expense, but to those paid to courts or their officers . . . ." *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 175 (Tex. 2013). "As [the Supreme Court of Texas has] recognized for decades, the term costs is generally understood [to mean] the fees or compensation fixed by law collectible by the officers of court, witnesses, and such like items, and does not ordinarily include attorney's fees which are recoverable only by virtue of contract or statute." *Id.* (quoting *Johnson v. Universal Life & Accident Ins. Co.*, 94 S.W.2d 1145, 1146 (Tex. 1936)) (internal quotation marks omitted).

For purposes of Rule 131, "[a] 'successful party' is 'one who obtains judgment of a competent court vindicating a civil right or claim.'" *Henry v. Masson*, 453 S.W.3d 43, 50 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *City of Houston v. Woods*, 138 S.W.3d 574, 581 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

Rule 141 provides an exception to the mandate of Rule 131: "The court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." TEX. R. CIV. P. 141. "'Good cause' is a very

elusive concept which can only be determined on a case-by-case basis." *Rogers v. Walmart Stores, Inc.*, 686 S.W.2d 599, 601 (Tex. 1985). The award and allocation of court costs under Rules 131 and 141 are matters for the trial court's discretion and will not be overturned on appeal unless the trial court abused its discretion. *See Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 376 (Tex. 2001); *Rogers*, 686 S.W.2d at 601; *Henry*, 453 S.W.3d at 50–51.

### 1.    *Expert witness fees*

Cates, Industrial, and GTS first argue that they are entitled to an award for the expense of paying their forensic accountant. They contend that (1) the parties filed two Rule 11 agreements with the court requiring such an award, and (2) they thus showed "good cause" under Rule 141.

A prevailing party may not recover the costs of accountants and other expert witnesses under Rule 141, regardless of whether good cause is shown. *See, e.g.*, *Griffin v. Carson*, No. 01-08-00340-CV, 2009 WL 1493467, at *7 (Tex. App.—Houston [1st Dist.] May 28, 2009, pet. denied) (mem. op.); *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 212 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also Richards v. Mena*, 907 S.W.2d 566, 571 (Tex. App.—Corpus Christi 1995, writ dism'd) ("Regardless of any good cause shown, costs of experts are incidental expenses in preparation for trial and not recoverable."); *King v. Acker*, 725 S.W.2d 750, 755 (Tex. App.—Houston [1st Dist.] 1987, no writ) (costs of

experts "are litigation expenses and are not recoverable"); *Whitley v. King*, 581 S.W.2d 541, 544 (Tex. App.—Fort Worth 1979, no writ) (Rule 141 "good cause" finding cannot support award of expert costs).

Cates, Industrial, and GTS nevertheless argue that *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204 (Tex. App.—Houston [14th Dist.] 2009, no pet.), provides support for an award of expert expenses as costs under Rule 141. On the contrary, *Headington Oil* overturned a trial court's award of such "costs" because the award lacked support in the record. 287 S.W.3d at 212–13. Our sister court did not hold that such expenses were recoverable under Rule 141. Moreover, our own precedent and the weight of authority in other courts hold to the contrary. *See Griffin*, 2009 WL 1493467, at \*7; *see also Richards*, 907 S.W.2d at 571; *King*, 725 S.W.2d at 755; *Whitley*, 581 S.W.2d at 544.

These cases notwithstanding, Cates, Industrial, and GTS argue that the trial court was required to award them the costs of their forensic accountant by virtue of a pair of agreements.

The first agreement, an agreed order, states merely that the costs of the first report would be "treated as cost[s] of this suit," which we interpret to mean that those costs would be recoverable by the "successful party" under Rule 131. Indeed, Cates, Industrial, and GTS argue that, as "the prevailing party," they are

51

entitled to have the full cost of the first report taxed against Bergin, Jacquin, and PRI.

But Cates, Industrial, and GTS are not the only prevailing parties in this case. The trial court's judgment awarded damages to PRI and against Cates for breach of fiduciary duty and conversion. Moreover, Cates, Industrial, and GTS do not attempt to link the costs of the financial audit to any particular claim or defense, nor did they attempt to do so in their motion for costs in the trial court. They complain that the costs were necessary and assert that they prevailed, but the record does not support their assertions. On the contrary, to the extent that the financial audits were relevant to the claims that Cates breached a fiduciary duty or converted property of PRI, those are claims on which Cates lost. We cannot say, based on this record, that the trial court abused its discretion in allowing each party to bear its own costs in connection with the first accounting audit and report.

The second agreement, made under Rule of Civil Procedure 11, governed a subsequent report. It provides, "Each accountant['s] costs in complying with this Rule 11 and issuance of the amended/supplemental report shall be totaled, then split equally between the parties." According to Cates, Industrial, and GTS, in this document "the parties *agreed* on a way to treat these costs in this enforceable court order, which constitutes sufficient 'good cause' to tax at least half of the total cost of the Supplemental Joint Report against PRI, Bergin and Jacquin." They

conclude that the trial court "erred in not taxing them as such," relying on Rule 11 and *Eaton Metal Products, L.L.C. v. U.S. Denro Steels, Inc.*, No. 14-09-00757-CV, 2010 WL 3795192 (Tex. App.—Houston [14th Dist.] Sept. 30, 2010, no pet.) (mem. op.), for the proposition that a trial court has "a ministerial duty to enforce a valid Rule 11 agreement" and thus no discretion to do otherwise. *Eaton Metal Prods.*, 2010 WL 3795192, at *2.

The Rule 11 agreement did not, however, specify that the costs of the supplemental report were to be taxed as costs of court. Its only use of the term "costs" was in the context of the phrase "[e]ach accountants' [sic] costs in complying with this Rule 11 and issuance of the amended/supplemental report," not in the sense of costs of court. Further, the Rule 11 agreement did not require the trial court to do anything with respect to the costs of the supplemental report. Instead, it provided merely that the costs "shall be totaled, then split equally." It made no mention of court costs, Rule 131, Rule 141, or any other basis for the trial court to award the expenses in question *as costs*, which the trial court otherwise has no authority to do. Instead, the Rule 11 agreement merely created a contractual obligation in each group of parties to pay one-half of all parties' combined accountant costs. The trial court was not obligated—and, indeed, had no power—to enforce that agreement through an award of costs under Rules 131 or

141. *See Griffin*, 2009 WL 1493467, at *7; *see also Richards*, 907 S.W.2d at 571; *King*, 725 S.W.2d at 755; *Whitley*, 581 S.W.2d at 544.[13]

We hold that the trial court did not abuse its discretion in declining to award Cates, Industrial, and GTS the costs of their forensic accountant.

## 2. *Special master*

Cates, Industrial, and GTS also argue that they should recover as costs $4,995 in expenses that they incurred in connection with the special master whom the trial court appointed to conduct electronic searches and make privilege determinations to resolve discovery disputes between the parties regarding production of emails. Their reasoning is based entirely on Rule 141.[14] Again, however, they do not attempt to tie the special master's costs to any particular claim or defense, nor do they identify any particular documents produced as a

---

[13] Instead, to enforce the Rule 11 agreement, Cates, Industrial, and GTS have a claim for substantive relief, namely enforcement of a contract. *See, e.g.*, *EP Energy E&P Co., L.P. v. Cudd Pressure Control, Inc.*, No. 14-13-00734-CV, 2014 WL 7345938, at *3 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, pet. denied) (mem. op.); *In re M.A.H.*, 365 S.W.3d 814, 818–19 (Tex. App.—Dallas 2012, no pet.); *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 309 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

[14] Costs incurred in connection with special masters are actually governed by Rule 171. TEX. R. CIV. P. 171. No party, however, mentions Rule 171 in its briefs, nor did Cates, Industrial, and GTS mention it in their motion for costs. Cates, Industrial, and GTS have therefore not preserved any argument based on Rule 171 for appeal. We note, however, that we would reach the same conclusion if they had preserved it, as they fail to show that they were prevailing parties for purposes of a costs award.

result of the special master process. Instead, they argue that the entire special master process was important because "[a] majority of Cates et al.'s affirmative causes of action and defenses in this suit derive from email communications between the parties, their employees, customers, and manufacturers." Although they argue that "32 emails produced in this search played a critical role in trial," they do not identify the emails in question or explain their relevance to any cause of action or defense. Moreover, the award of costs under Rule 141 is a matter for the trial court's discretion. Cates, Industrial, and GTS do not demonstrate that the trial court abused that discretion.

Because Cates, Industrial, and GTS have failed to demonstrate that they are entitled to an award of costs related to the forensic accounting audits or the special master, we overrule their second issue.

## Prejudgment Interest

Finally, in their eleventh issue, Bergin, Jacquin, and PRI argue that the trial court erred in assessing prejudgment interest on the net amount of damages and attorney's fees due to each party under the judgment. Cates, Industrial, and GTS respond that each portion of the trial court's calculations and interest award was supported by the evidence and controlling or persuasive authority.

The trial court's judgment first awarded $351,000 to PRI against Cates for breach of fiduciary duty and conversion. It then awarded $200,000 to Cates,

Industrial, and GTS against PRI for tortious interference, conversion, and breach of the commission-split and rent agreement. The trial court offset these amounts and added to the result $682,000 in attorney's fees, which it awarded to Cates, Industrial, and GTS. The trial court concluded that this resulted in a net judgment to Cates, Industrial, and GTS against PRI in the amount of $531,000. The trial court awarded prejudgment interest on this amount.

The trial court then proceeded to award $283,000 to Cates, against Bergin and Jacquin, jointly and severally, for breach of fiduciary duty and oppressive behavior, along with prejudgment interest on that amount. It then awarded 40% of that same amount, or $113,200, to Cates, against Bergin and Jacquin, jointly and severally, for the same claims, and further prejudgment interest on that amount.[15]

Although we reverse portions of the trial court's judgment today, numerous awards of fees and damages remain undisturbed: (1) the award to Cates, Industrial, and GTS for tortious interference with prospective contracts, (2) the award to Cates for oppressive conduct, (3) the award to Cates, Industrial, and GTS for breach of the commission-split and rent agreement, (4) the award to PRI for Cates's breach

---

[15]    In our holding on Bergin, Jacquin, and PRI's third issue, however, we determined that no evidence supported the jury's finding that Bergin and Jacquin breached a fiduciary duty owed to Cates. These awards are therefore reversed to the extent that they reflect damages for Cates's breach of fiduciary duty claim, and we mention them here only to explain the trial court's calculations relevant to prejudgment interest.

of fiduciary duties, (5) the award to PRI for conversion, and (6) the attorney's fees awarded to each party. We therefore consider whether the trial court's judgment contains error in its award of prejudgment interest on these amounts.

## A.     Prejudgment interest on attorney's fees

Bergin, Jacquin, and PRI first argue that the effect of the trial court's judgment was to award prejudgment interest on attorney's fees and that this constitutes error. We agree.

Generally speaking, prejudgment interest is not available on attorney's fees. *See Hervey v. Passero*, 658 S.W.2d 148, 149 (Tex. 1983); *Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 931 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Cushman & Wakefield, Inc. v. Fletcher*, 915 S.W.2d 538, 547 (Tex. App.—Dallas 1995, writ denied); *Berry Prop. Mgmt., Inc. v. Bliskey*, 850 S.W.2d 644, 670 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.). Cates, Industrial, and GTS attempt to avoid this rule by arguing that they paid $90,555.62 in attorney's fees before trial.[16] As they observe, some courts have allowed prejudgment interest on attorney's fees actually paid by a party

---

[16]    We also note that Cates, Industrial, and GTS do not support their calculations. They cite to 127 consecutive pages of the record apparently reflecting various charges and payments of fees. They also cite to an appendix to their brief, which is not in the record and cannot be considered on appeal. We are not required to scour the record to perform our own calculation of the amounts paid before trial, and we decline the invitation to do so.

before judgment. *See Nova Cas. Co. v. Turner Constr.*, 335 S.W.3d 698, 706 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (allowing such recovery); *A.V.I., Inc. v. Heathington*, 842 S.W.2d 712, 717 (Tex. App.—Amarillo 1992, writ denied) (same); *see also MMR Int'l Ltd. v. Waller Marine, Inc.*, Civ. A. No. H-11-1188, 2013 WL 6491186, at *12 (S.D. Tex. Dec. 10, 2013) (same). To the extent that this Court has considered the issue, however, we have held that no interest is recoverable on attorney's fees. *See Sentinel Integrity Solutions*, 414 S.W.3d at 931 (prejudgment interest on attorney's fees is unavailable in suit under Covenants Not to Compete Act); *Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 406 n.10 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (noting in dicta that prejudgment interest is not available on attorney's fees).

Cates, Industrial, and GTS argue that this case presents a case of first impression because no Texas court of appeals has considered whether prejudgment interest is proper on an award that offsets damages with attorney's fees. We disagree that this case calls for any special consideration or novel analysis with respect to interest calculations. Applying the prejudgment interest rate to the combined parts of the net judgment has the same effect as applying that rate to each component of the judgment, assuming the starting dates are chosen correctly. In other words, the legal question is simply whether prejudgment interest is available on attorney's fees, not whether it is available on a sum that happens to

58

involve attorney's fees. While this case may present an unusual factual posture, it does not present any legal issues of first impression.

We hold that the trial court erred by applying prejudgment interest to the attorney's fees award to Cates, Industrial, and GTS. We note that the judgment does not identify the dates from which prejudgment interest should run against any party, nor does it calculate prejudgment interest up to the date of judgment. We therefore remand the case to the trial court for correction of its interest calculations. On remand, the trial court should determine the appropriate start date for prejudgment interest on each award of damages and calculate that interest separately for each award of damages. It should not apply any prejudgment interest on attorney's fees. Only after performing these calculations should the trial court consider whether any offsets in the resulting amounts are appropriate.

## B.     Prejudgment interest against Bergin and Jacquin

Bergin, Jacquin, and PRI also argue that the trial court's award of prejudgment interest against Bergin and Jacquin constitutes error. They premise this argument on two assertions: (1) "the damages found by the jury for breach of fiduciary duty and oppressive conduct were already considered by the Court in offsetting the damage awards to arrive at the prejudgment interest on the 'net' judgment amount noted in the preceding paragraph;" and (2) once the "excessive and improper attorney fee award for Cates" is removed from the calculation, there

59

is no net judgment for Cates, Industrial, and GTS for purposes of prejudgment interest calculations. They do not cite to the record or to any authority in support of these arguments.

The first argument is factually incorrect. The offsetting awards in the judgment are the award to PRI for breach of fiduciary duty and conversion and the award to Cates, Industrial, and GTS against PRI for tortious interference, conversion, and breach of the commission-split and rent agreement. The awards to Cates individually for Bergin and Jacquin's breaches of fiduciary duty—which we have reversed—and oppression are not included in the calculation. We therefore reject the first argument.

We also reject the second argument—that the "excessive and improper attorney fee award to Cates" must be removed—because we have already held that Bergin, Jacquin, and PRI waived their attack on the attorney's fees award itself by inadequately briefing their eighth issue.

We sustain Bergin, Jacquin, and PRI's eleventh issue in part and overrule it in part.

**Conclusion**

We reverse the trial court's judgment to the extent that it relies on the jury finding that the April 12, 2010 document was an enforceable agreement and declare that it is unenforceable. As an unenforceable agreement, that document

60

cannot serve as a basis for awarding damages or attorney's fees. We also reverse the trial court's award of damages against Bergin and Jacquin for breach of fiduciary duties owed to Cates. We further reverse the award against PRI for conversion and render judgment that Cates take nothing by that claim. Finally, we reverse the trial court's inclusion of attorney's fees in its calculation of prejudgment interest. We otherwise affirm the judgment of the trial court. We remand the case to the trial court for calculation of prejudgment interest in accordance with this opinion.

Harvey Brown
Justice

Panel consists of Justices Keyes, Higley, and Brown.